IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| KELLEY MALTBY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 2:20-CV-75-KFP |
| ) | |
| ALABAMA MUNICIPAL INSURANCE ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kelley Maltby brings this lawsuit against Defendant Alabama Municipal Insurance Corporation ("AMIC"), alleging gender discrimination and retaliation under Title VII and a violation of the Equal Pay Act. *See* Doc. 19. AMIC filed a motion for summary judgment (Doc. 38) and supporting memorandum (Doc. 39), Maltby filed a response (Doc. 40) and supporting memorandum (Doc. 41), and AMIC filed a reply (Doc. 42). Upon consideration of the parties' submissions, the record, and the relevant law, AMIC's motion for summary judgment (Doc. 38) is GRANTED in part and DENIED in part for the reasons set forth below.

**I.    STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The

parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the Court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3).

"In reviewing whether the nonmoving party has met its burden, the [C]ourt must stop short of weighing the evidence and making credibility determinations of the truth of the matter." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992) (citation omitted). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (citations and internal quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on

which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## II.   STATEMENT OF UNDISPUTED FACTS[1]

In June 2001, AMIC hired Maltby as an Underwriting Assistant. At that time, at least some of Maltby's duties were consistent with that of a receptionist. On May 1, 2002, AMIC promoted Maltby to the position of Account Executive in AMIC's Sales Department, and she served in this position until her termination in 2019. Jim Chamblee, the Sales Manager, supervised the AMIC Account Executives. Jay Powell and Mike Gardner were also employed as Account Executives, and they both received higher salaries than Maltby.

Powell has worked in insurance sales since 1984. In 1994, Powell worked as an Account Executive for Meadowbook Insurance, a third-party administrator of AMIC, where he first began working on the AMIC account. In 2001, Powell became employed directly for AMIC as an Account Executive. Gardner began working as an insurance Account Executive in 1988. In 1997, Gardner was hired as an Account Executive at Meadowbrook and started selling AMIC products to municipalities.[2] Prior to working directly for AMIC, both Powell and Gardner contributed in expanding AMIC's customer base while working in sales at Meadowbrook. Maltby acknowledges that Powell and

---

[1] These facts are undisputed by the parties and are contained in both AMIC's and Maltby's supporting memorandums (Docs. 39, 41).

[2] Gardner testified that he believes he began working directly for AMIC in 2000. Doc. 41-5 at 10:18-20.

Gardner had experience specifically with AMIC, at the very least, five years before she acquired such experience.

Maltby's first job in the insurance industry was in 1989 or 1990. At that time, she answered the telephone and was an assistant to the underwriters and customer service agents for a local independent insurance agency, Dale Farrior. While working with Dale Farrior, Maltby did not have an insurance license. Maltby next worked for Palomar Insurance Agency for several years, and she obtained her insurance license while there. Like Powell and Gardner, Maltby later also worked at Meadowbrook; however, she worked mainly in the office as a customer service representative. After Maltby left Meadowbrook, her insurance license lapsed until 2002. When she came to AMIC as an Account Executive, Maltby had no sales responsibility or experience going out in the field as a salesperson. Similarly, at that time, Maltby did not have established relationships with municipal officials—relationships that would have been cultivated by going on the road and meeting with officials.

On June 30, 2018[3], while still employed with AMIC, Maltby filed an EEOC charge of discrimination against AMIC. In her Amended Complaint, Maltby alleges that AMIC President, Steve Wells, flirtingly commented on her appearance and badgered her about her love life. These allegations are the same instances described in the affidavit attached to her 2018 EEOC charge. On March 1, 2019, Maltby received a 90-day right to sue letter

---

[3] It appears, based on the Amended Complaint and later statements by the parties, that Maltby actually filed her EEOC charge on July 30, 2018. *See, e.g.,* Doc. 19 at 4. The exact filing date, although relevant to the parties' arguments, ultimately has no bearing on the Court's analysis.

from the EEOC on her 2018 charge. Maltby did not file suit prior to the expiration of her right-to-sue deadline.

In support of Maltby's gender discrimination claim, the Amended Complaint alleges that she was "regularly not invited to participate in any business trips, including deep-sea fishing and an excursion to Las Vegas, which were trips the men of the office largely and separately enjoyed." Doc. 19 at 3. However, Maltby has no knowledge regarding when these "business trips" took place, who organized the trips, who paid for the trips, who attended the trips, or who selected the attendees. In support of her retaliation claim, Maltby testified that, after she filed her EEOC charge, she was "instructed not to go into the office." Doc. 39-2 at 115:7. However, Maltby's normal work pattern, both before and after her EEOC charge, was that she was never physically in the office for more than a few hours, one day a week.

In November 2018, Chamblee noticed improper requests for personal meal reimbursements in Maltby's expense reports and notified Wells.[4] AMIC retained the accounting firm of TaylorChandler LLC to audit Maltby's expense reimbursements. TaylorChandler calculated that, during her employment, Maltby received over-reimbursement of mileage expenses of approximately $8,200 and over-reimbursement of meals and other travel related expenses of approximately $5,600. TaylorChandler's report is dated June 4, 2019. AMIC terminated Maltby's employment effective June 5, 2019.

---

[4] These were meals Maltby had during work assigned travel but were not shared with clients. AMIC maintains that its policy is to reimburse meals for Account Executives only when they call on AMIC customers and entertain them—not personal meals—during day trips. Doc. 39 at 8. Maltby disagrees. Doc. 41 at 1, n.1.

Maltby alleges in her Amended Complaint that AMIC discriminated against her because of her gender in violation of Title VII; retaliated against her because of her EEOC charge in violation of Title VII; and subjected her to pay discrepancies in violation of the Equal Pay Act. *See generally* Doc. 19.

### III. DISCUSSION

#### A. Gender Discrimination Claim

Title VII prohibits employers from discrimination against individuals with respect to compensation, terms, conditions, or privileges of employment because of the individual's sex. 42 U.S.C. § 2000e-2(a)(1). In a case like this one, where there is no direct evidence of discrimination, a plaintiff must demonstrate discrimination using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). To establish a prima facie case of discrimination under this framework, the plaintiff must prove four elements: (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action. *Burke–Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If the

7

defendant articulates such a reason, then the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for discrimination. *Id.* "The burden of proving pretext merges with the plaintiff's ultimate burden of proving that [sex] was a determining factor in [her] discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (citation omitted). Importantly, however, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

AMIC does not dispute that Maltby can demonstrate each of the four elements necessary to establish a prima facie case of discrimination, as Maltby is a female; she was qualified for the position of Account Executive; she was terminated from that position, which constitutes an adverse employment action; and she was replaced by a male. Doc. 39 at 21. In response, AMIC has presented evidence to support a legitimate, non-discriminatory reason for Maltby's termination—specifically, improprieties in Maltby's expense reimbursements. AMIC argues that its policy is to reimburse meals for Account Executives only when they call on AMIC customers and entertain them, rather than personal meals, and that, based on the report of a third-party accounting firm, Maltby received over-reimbursement of approximately $5,600 in meals and other travel-related expenses as well as approximately $8,200 in mileage expenses over the course of her employment. Doc. 39-8 at 2.

Because AMIC articulated a legitimate, non-discriminatory reason for Maltby's termination, the burden shifts back to Maltby to show that this reason is a pretext for discrimination. Maltby disputes AMIC's reimbursement policy and presents evidence in support of her position. First, she provides evidence that her expense reports were approved by AMIC President Steve Wells. Doc. 41-11. Second, she provides evidence in the form of the AMIC Employee Handbook, which states,

> AMIC will reimburse employees for reasonable business travel expenses incurred while on assignments away from the normal work location. All business travel must be approved in advance by the AMIC President.[] When approved, AMIC will reimburse the actual costs of travel, lodging, and other expenses directly related to accomplishing business travel objectives.[] Expenses that generally will be reimbursed include . . . meals.

Doc. 41-12 at 2. Maltby notes that the handbook is not specific as to which meals should be reimbursed and which should not, and she provides evidence that the meal reimbursement policy was not clarified in any writings to AMIC employees during her employment.[5] Docs. 41-4 at 15:15-19; 41-5 at 18:14-20. Accordingly, the Court finds Maltby has presented enough evidence to raise a genuine issue as to what AMIC's reimbursement policy was and whether Maltby violated it.

However, this alone is not sufficient to defeat summary judgment; as noted above, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163. In support of her claim that she was terminated as a result of gender discrimination, Maltby testified

---

[5] In its reply brief, AMIC admits that a more specific policy was not documented in writing. *See* Doc. 42 at 9.

that she believes Wells has historically fired more women than men and that she believes Wells does not hold women in as high regard as men.[6] Doc. 39-2 at 101:9-10; 105:3-4. Maltby also testified that she believes she was sexually harassed; that Wells threw M&M candies at her and other females[7]; and that Wells commented on her appearance and inquired about who she was dating during her employment. *Id.* at 107:12-18; 277:18-19; 191:11-17. Maltby further testified that she believed Wells "wanted a man in [her] position rather than [her] as a woman." *Id.* at 108:23-109:1. In support of that statement, Maltby cites in her brief Wells's deposition testimony, in which he stated:

> "[F]ive or six years earlier, I had a conversation with a lot of the employees about moving into and up the ladder. And the message was you have to go through sales. And if you want to go through sales, you need to get your license. And if a spot comes up, and you have your license, then you will be considered. [Will Strength, the individual who replaced Maltby after she was terminated] was one of the ones that had his license."

Doc. 39-7 at 178:17-179:3.

Even assuming the Court may consider the entirety of this evidence[8], and even accepting it as true and drawing all justifiable inferences in Maltby's favor, as the Court is required to do at this stage, it does not reasonably indicate that Maltby was terminated

---

[6] Maltby testified that, as to her belief that Wells has fired more women than men, she is aware of two women fired by Wells and one man. Doc. 39-2 at 101:4-22; *see also* 122:3-7 (Q: "We really can't go on your memory about the number of females and number of males that have been or have not been fired, because you just don't know, right?" A: "I have no statistical information."). Maltby also testified that, in forming her personal opinion that Wells does not hold women in as high regard as men, she completely discounts the number of women he has hired to work for AMIC. *Id.* at 106:3-7.

[7] Maltby admits she does not know whether Wells threw M&M candies at males. Doc. 39-2 at 278:7-9.

[8] AMIC argues that Maltby cannot rely on certain allegations because they were contained in her 2018 EEOC charge, and Maltby failed to file this lawsuit within the requisite 90-day window. *See* Doc. 39 at 22.

because of her gender. Maltby's—vague and, in some cases, unsupported—testimony that Wells previously fired two women and only one man; held men in higher regard than women; and, on some unspecified occasion(s) over the course of Maltby's 17-year employment with AMIC, made boorish comments or threw M&M candies at her does not demonstrate any causal nexus between her gender and her termination. *See Jarvis v. Lee Cnty. Sch. Dist.*, No. 2:08-CV-605, 2010 WL 11506985, at *4 (M.D. Fla. Feb. 4, 2010) (granting summary judgment on gender discrimination claim because the plaintiff's testimony that he was treated differently than female co-workers was "largely supposition" and, more pertinently, did not relate to his termination).[9]

Moreover, Wells's cited deposition testimony does not reasonably support a finding that Wells wanted a man in Maltby's position. It simply demonstrates that, five to six years ago, Wells discussed the possibility of moving up the ladder with "a lot of [his] employees." Doc. 39-7 at 178:17-179:3. Wells did not indicate whether those employees were male or female, did not mention Maltby's position specifically, and did not guarantee any individual a position in sales. Instead, he stated that *if* a position opened up, and *if* an individual had their license, they would be considered for the open position. Nothing in

---

[9] *See also Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002) (finding an isolated discriminatory comment unrelated to the adverse employment decision, taken alone, insufficient to establish a material fact on pretext where no additional evidence supported a finding of pretext); *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 (6th Cir. 2012) (stating that discriminatory remarks unrelated to the adverse employment decision did not constitute evidence of discrimination and, therefore, did not establish pretext); *Stover v. Martinez*, 382 F.3d 1064, 1077-78 (10th Cir. 2004) (concluding that isolated remarks unrelated to a disputed employment action are insufficient to demonstrate discriminatory animus and that a plaintiff must instead demonstrate a nexus between the alleged discriminatory comments and the disputed employment action); *Mells v. Shinseki*, No. 8:13-CV-3214, 2015 WL 4716212, at *6 (M.D. Fla. Aug. 7, 2015) (stating that a decisionmaker's discriminatory remarks are probative only if they illustrate the decisionmaker's state of mind at the time of the adverse employment action and stray remarks that are isolated and unrelated to the adverse employment action are insufficient in that regard).

that statement suggests that Maltby's subsequent termination years later was due to gender discrimination.

Because Maltby has failed to demonstrate a connection between her proffered evidence and her termination, that evidence does not establish AMIC's reason for her termination is a pretext for discrimination or create a genuine issue of material fact as to whether her gender was a determinative factor in her termination. *See Martinez v. Gulf Coast Ortho. Ctr. Corp.*, No. 8:17-CV-77, 2019 WL 3577214, at *10 (M.D. Fla. Aug. 6, 2019). Accordingly, AMIC is entitled to summary judgment on Maltby's gender discrimination claim.

### B. Retaliation Claim

To establish a prima facie case of retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there was some causal relation between the two events." *Williams v. Apalachee Ctr., Inc.*, 315 F. App'x 798, 799 (11th Cir. 2009) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." *Id.* If the employer does so, the plaintiff then bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for retaliatory conduct. *Id.*

Maltby claims she was terminated in retaliation for filing her 2018 EEOC charge. AMIC argues that Maltby cannot satisfy the causation element necessary for her prima facie case because she was not terminated until approximately 11 months after she filed

the EEOC charge. Based on the record evidence, the Court disagrees. As AMIC notes in its reply brief, both the Eleventh Circuit and the Supreme Court have consistently held that, for a plaintiff to rely *solely* on temporal proximity between an employer's knowledge of protected activity and an adverse employment action as evidence of causality, the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001); *see also Ramirez v. Bausch & Lomb, Inc.*, 546 F. App'x 829, 832 (11th Cir. 2013). A three-to-four-month disparity between the statutorily protected expression and the adverse employment action is generally insufficient. *Breeden*, 532 U.S. at 273-74. Here, there is roughly an 11-month gap between Maltby's July 2018 filing and June 2019 termination.

However, Maltby does not rely *solely* on temporal proximity to establish her claim; she has provided other evidence sufficient to demonstrate causation to defeat summary judgment. First, Maltby provides evidence that Wells knew of her EEOC charge throughout the events discussed herein as well as when her right-to-sue period ended (Doc. 41-2 at 39:20-40:1; 61:3-62:2; 96:6-17), and it is undisputed that Maltby was terminated mere days after the expiration of the right-to-sue period. Second, in November 2018, Wells issued Maltby three concurrent warnings for alleged company violations that occurred earlier that year—during the past summer, in August, and in October, respectively—and she avers that she never received any warnings prior to filing her EEOC charge. Doc. 41-8; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991), *superseded by statute on other grounds* ("The pronounced increase in negative reviews and the careful scrutiny of [plaintiff's] performance, coupled with testimony suggesting that

13

management personnel were acutely aware of [plaintiff's] EEOC charge, is sufficient to establish a causal link for [plaintiff's] prima facie case of retaliatory discharge.").

Third, Maltby testified that, after filing her EEOC charge, she did not receive quarterly bonuses as she had in the past and was denied a salary increase despite receiving increases every year for the past 17 years of employment. Doc. 41-1 at 114:4-7; 281:6-19. Finally, Maltby testified that, after filing her EEOC charge, Chamblee told her, "[Wells is] going to make you pay."[10] *Id.* at 214:2-5. Thus, Maltby does not rely solely on temporal proximity to establish the causation element of her prima facie retaliation claim. Her subsequent changes in the work environment, including numerous warnings issued, in some cases, months after the alleged violations, denied bonuses, denied salary increases, and her supervisor's comment that Wells was "going to make [her] pay," together are sufficient to demonstrate a plausible causal relationship between Maltby's EEOC charge and termination.

Because Maltby has established a prima facie case of retaliation, AMIC must articulate a legitimate, non-retaliatory reason for her termination. *Williams*, 315 F. App'x at 799 (citing *Pennington*, 261 F.3d at 1266)). As discussed above, AMIC has articulated such a reason—Maltby's alleged policy violation resulting in her over-reimbursement of meal and travel expenses. In response, to establish a pretext for retaliation, Maltby must show both that AMIC's reason was false and that retaliation was the real reason. *Gogel v.*

---

[10] In its reply brief, AMIC argues that "Chamblee's opinion of Wells'[s] personality in no way shows discrimination" or retaliation. Doc. 42 at 7. However, whether Chamblee was referring to Maltby's EEOC charge when he told her that Wells was going to "make [her] pay" is a factual question that is not for the Court to decide.

*Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). Upon review, the Court finds that Maltby has provided sufficient evidence from which a reasonable factfinder could find AMIC's explanation to be unworthy of credence and that retaliation was the real reason for her termination.

First, for the reasons set forth above, the Court finds that Maltby has presented sufficient evidence to raise a genuine issue as to what AMIC's reimbursement policy was and whether Maltby violated it—namely, the fact that Wells approved all her expense reports and the AMIC Employee Handbook, which states that meals will be reimbursed while on assignments and does not specify which meals. Second, the Court finds that Maltby has presented sufficient evidence for a reasonable factfinder to conclude that retaliation was the real reason for her termination—namely, that Wells knew of her EEOC charge and when her right-to-sue period expired; she was terminated only days following the expiration of the right-to-sue period; following her EEOC charge, she was issued multiple warnings for violations that occurred months prior despite having never been issued a warning before her EEOC charge; following her EEOC charge, she was denied quarterly bonuses and a salary increase despite having received both each year in the past; and, following her EEOC charge, Chamblee told her that Wells was "going to make [her] pay."

Thus, Maltby has presented evidence that the proffered reason for her termination was pretextual. Construing the evidence presented and all justifiable inferences drawn from the evidence in Maltby's favor, as this Court is required to do, the Court finds that the

record establishes a genuine issue of material fact that precludes summary judgment as to this claim.

    **C.    Equal Pay Claim**

"To establish a prima facie case under the [Equal Pay Act ("EPA")], the plaintiff must show 'that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Butler v. Albany Int'l*, 273 F.Supp.2d 1278, 1288 (M.D. Ala. 2003) (quoting *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992)).

Once a prima facie case is demonstrated, the employer must demonstrate by a preponderance of the evidence that the difference in pay is justified by one of four exceptions: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any additional factor other than sex. *Id.* at 1289-90; *see also* 29 U.S.C. § 206(d)(1). The employer's burden is a heavy one, as the exceptions granted within the EPA constitute affirmative defenses. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). "[A] defendant invoking an affirmative defense under the EPA must show that the factor of sex provided no basis for the wage differential." *Butler*, 273 F.Supp.2d at 1290 (citations omitted). If the defendant overcomes its burden, "the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential." *Id.* (citing *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995)).

It is undisputed that Maltby has established a prima facie case under the EPA; AMIC admits that Maltby received a lower salary than Powell and Gardner, the two men employed in her same job classification.[11] *See* Docs. 39 at 25, 42 at 12. However, AMIC contends that the pay differential is justified based on the fourth exception—a differential based on any additional factor other than sex. This exception applies when a pay disparity "results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." *Glenn v. Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988)).

AMIC claims, and provides evidence to support, that Powell and Gardner's higher salaries were based on their superior experience rather than their gender. Specifically, AMIC offers evidence of the following facts, which are not disputed by Maltby: Powell has worked in insurance sales since 1984, and Gardner began working as an insurance Account Executive in 1988. In 1994, Powell worked as an Account Executive for Meadowbook and began working on the AMIC account and, in 2001, he became employed directly for AMIC as an Account Executive. In 1997, Gardner was hired as an Account Executive at Meadowbrook and began selling AMIC products to municipalities. Prior to working directly for AMIC, Powell and Gardner both contributed to expanding AMIC's customer base while working in sales at Meadowbrook. Maltby, on the other hand, had *no* sales responsibility or experience going out in the field as a salesperson before 2002, when she was hired by AMIC as an Account Executive—years after her comparators had been

---

[11] Specifically, at the time of her termination in June 2019, Maltby received an annual salary of $71,666.00 and Powell and Gardner both received an annual salary of $83,340.00. *See* Doc 41-14.

working in sales and with AMIC products. Prior to becoming an AMIC Account Executive, Maltby did *not* have established relationships with municipal officials.

Maltby does not dispute that Powell and Gardner were involved in insurance sales years before her, that they had experience specifically with AMIC at least five years before she began acquiring any, or that they contributed to expanding AMIC's customer base. Nevertheless, Maltby contends she "also maintained a successful career in the insurance industry with comparable experience to" Powell and Gardner. Doc. 41 at 26. In support of that claim, she provides evidence that she worked for various employers in the insurance industry throughout the 1990s. Specifically, she worked for various independent agencies in the insurance field while in college; she worked for Dale Farrior for approximately two years, where she assisted underwriters and customer service agents; she worked for Palomar Insurance Agency, where she worked in the personal lines and life and health departments; and, during her employment at Palomar, she obtained her insurance license and her duties included processing new policies, renewal policies, endorsements, and cancellations and selling personal, automobile, homeowners, life, and health insurance. *Id.* at 26-27. Although she also worked at Meadowbrook for a brief period where she "became familiar with AMIC products," she does not allege nor provide any evidence that she sold AMIC products or established any kind of customer base prior to her 2002 AMIC employment.

None of the evidence Maltby proffered demonstrates that she has comparable experience working in insurance sales or selling AMIC products; indeed, she does not dispute that Powell and Gardner acquired experience in each of those areas years before

18

she gained similar experience. Nor does the evidence discount the work Powell and Gardner performed for AMIC expanding its customer base or suggest that Maltby similarly helped AMIC expand its customer base. To the extent Maltby believes Powell and Gardner should not have been entitled to a higher salary based on these factors, she offers no evidence that AMIC's reasoning for the experience-based wage differential is pretextual or, instead, offered as a post-event justification for a gender-based differential.[12] Accordingly, AMIC is entitled to summary judgment on Maltby's EPA claim. *See Cazeau v. Wells Fargo Bank, N.A.*, 614 F. App'x 972, 981 (11th Cir. 2015) ("Wells Fargo produced evidence showing that [the comparator] had significantly more experience than Cazeau, and experience is a 'factor other than sex.'[] Specifically, [the comparator] had worked at Wells Fargo since 1999, whereas Cazeau started in 2004. Cazeau did not offer any evidence to suggest that this reason was pretextual or 'offered as a post-event justification for a gender-based differential.'[] Consequently, the district court properly granted summary judgment to Wells Fargo on Cazeau's EPA claims.").

---

[12] In her brief, Maltby mentions that Strength, who replaced her as Account Executive in 2019, made an annual salary of "$69,000.00, only $1,666.00 less than" Maltby. Doc. 41 at 26; *see also* Doc. 41-14 at 4. First, the Court notes that the difference between Strength's and Maltby's salaries actually appears to be $2,666.00. Regardless, the Court does not find this supports a pretext finding because Strength made less than both Maltby and Maltby's male comparators and, more pertinently, he worked at AMIC for eleven years prior to becoming an Account Executive. *See* Doc. 41-14 at 4. Indeed, it appears that prior to becoming Account Executive, Strength made an annual salary of $68,281.00—only $719.00 less than his new salary. *See id.*

## IV. CONCLUSION

Accordingly, for the reasons set forth above, it is

ORDERED that AMIC's Motion for Summary Judgment (Doc. 38) is GRANTED in part and DENIED in part as set forth herein.

DONE this 18th day of October, 2021.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE